**IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GEOFFREY GITHUI KINYUA, brother of
MOSES MAGOTHE KINYUA, deceased

EDWARD NGATIA KINYUA, brother of
MOSES MAGOTHE KINYUA, deceased

JOSEPH WACHIRA KINYUA, brother of
MOSES MAGOTHE KINYUA, deceased

SUSAN WANJUGU WACHIRA, sister of
MOSES MAGOTHE KINYUA, deceased

MARY WANJIRU KINYUA, sister of
MOSES MAGOTHE KINYUA, deceased

WINNIE WANGUI KINYUA, sister of
MOSES MAGOTHE KINYUA, deceased

MARTIN MUNGA NJERI, informally adopted          **COMPLAINT**
son of MOSES MAGOTHE KINYUA,
an Employee of the United States                **Civil Action No.**
Government or an Employee of a Contractor
for the United States Government, deceased

   Plaintiffs,

 vs.

REPUBLIC OF THE SUDAN
Ministry of External Affairs
People's Palace
Khartoum, Sudan

and

MINISTRY OF THE INTERIOR
OF THE REPUBLIC OF THE SUDAN
People's Palace
Khartoum, Sudan

and

THE ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Khomeini Avenue, United Nations Street
Tehran, Iran

and

THE IRANIAN MINISTRY
OF INFORMATION AND SECURITY
Pasdaran Avenue
Golestan, Yekom
Tehran, Iran

Defendants.

## INTRODUCTION

GEOFFREY GITHUI KINYUA, et al., ("Plaintiffs"), file this lawsuit pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A or its predecessor law, 28 U.S.C. § 1605(a)(7), to the extent it continues to apply to this case, and related statutes. The lawsuit is brought to recover Plaintiffs' damages suffered as a result of the Sudanese and Iranian sponsored terrorist attack upon the Embassy of the United States located at Nairobi, Kenya on August 7, 1998.

The scope of potential plaintiffs in a lawsuit brought under 28 U.S.C. § 1605A, the new state sponsor of terrorism exception to foreign sovereign immunity, includes non-US nationals if the "claimant or victim was at the time" of the terrorist bombing an "employee of the Government of the United States . . ." or "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ." 28 U.S.C. § 1605A(a)(2)(A)(ii).

## JURISDICTION AND VENUE

1.      Jurisdiction in this Court arises pursuant to 28 U.S.C. §§ 1605A, 1330(a), 1331 and 1332(a)(2).

2.      The Plaintiffs in this case are non-U.S. nationals who were an "employee of the Government of the United States . . ." or were "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ." at the time of the bombings.

3.      Subject matter jurisdiction is properly asserted under 28 U.S.C. § 1605A. The Foreign Sovereign immunities Act provides that there "shall" be personal jurisdiction over a foreign state whenever there is subject matter jurisdiction over a claim for relief plus effective service of process. 28 U.S.C. § 1330(b).[1]

4.      While acting within the scope of their employment or office, agents, employees, and officials of the Islamic Republic of Iran ("Iran") provided the technical know-how and tactical training that allowed Al Qaeda to build the bombs that destroyed the U.S. Embassy at Nairobi, Kenya. This qualifies as material support as it is defined under 28 U.S.C. § 1605A. Subject matter jurisdiction is properly asserted under 28 U.S.C. § 1605A. The Foreign Sovereign immunities Act provides that there "shall" be personal jurisdiction over a foreign state whenever there is subject matter jurisdiction over a claim for relief plus effective service of process. 28 U.S.C. § 1330(b).

5.      While acting within the scope of their employment or office, agents, employees and officials of the Republic of Sudan ("Sudan") provided a broad range of critical support to Al Qaeda over a number of years without which Al Qaeda would never have been able to relocate

---

[1] Hereinafter, subsequent references to 28 U.S.C. § 1605A are intended to encompass both 28 U.S.C. § 1605A and its predecessor law, 28 U.S.C. § 1605(a)(7), to the extent it continues to apply to this case. 28 U.S.C. § 1605A on its face creates subject matter jurisdiction for US nationals and non-US national who were "employee[s] of the Government of the United States" or were "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ." 28 U.S.C. § 1605A(a)(2)(A)(ii). 28 U.S.C. § 1605(a)(7) only creates subject matter jurisdiction for US nationals.

from Afghanistan to Africa or grow into an organization capable of performing the attack on the U.S. Embassy at Nairobi, Kenya.  This qualifies as material support as it is defined under 28 U.S.C. § 1605A.

6.      The provision of material support by Iran and the Sudan meets the requirements for subject matter jurisdiction established by 28 U.S.C. § 1605A as to the non-national plaintiffs. 28 U.S.C. § 1605A allows non-US nationals, if the claimant or the victim was an "employee of the Government of the United States . . .", or "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ." 28 U.S.C. § 1605A(a)(2)(A)(ii), to bring suit against the state-sponsors of terrorism who caused their personal injury or death. All non-US nationals were either an employee of the Government of the United States, an individual performing a contract awarded by the United States Government acting within the scope of the employee's employment, or a family member thereof.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

8.      The causes of action contained in the four counts later enumerated herein in this Complaint are based upon the following sources of law:

a.   a new federal private right of action 28 U.S.C. § 1605A(c), which is available

     both to US national and non-US national Plaintiffs, and wherever the common or

     statutory law of a Plaintiff's residence contains rights or makes further damages

     available that are not duplicative of the recovery afforded under 28 U.S.C. §

     1605A(c), as Plaintiffs have causes of action under the common or statutory law

     of the US state or foreign country where they were domiciled at the time of the

     attack;

b.  for the non-US nationals Plaintiffs, who do not possess a cause of action under 28 U.S.C. § 1605A, the common and statutory laws of the District of Columbia or Kenya for wrongful death, solatium, loss of consortium, assault and battery, intentional infliction of emotional distress and survival, whether statutory or common law.

## THE PARTIES

## PLAINTIFFS

9.      Plaintiff, GEOFFREY GITHUI KINYUA, is a citizen of Kenya and is the brother of MOSES MAGOTHE KINYUA, deceased, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

10.     Plaintiff, EDWARD NGATIA KINYUA, is a citizen of Kenya and is the brother of MOSES MAGOTHE KINYUA, deceased, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

11.     Plaintiff, JOSEPH WACHIRA KINYUA, is a citizen of Kenya and is the brother of MOSES MAGOTHE KINYUA, deceased, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya.

Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

12.     Plaintiff, SUSAN WANJUGU WACHIRA, is a citizen of Kenya and is the sister of MOSES MAGOTHE KINYUA, deceased, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right for her loss of society and severe emotional distress.

13.     Plaintiff, MARY WANJIRU KINYUA, is a citizen of Kenya and is the sister of MOSES MAGOTHE KINYUA, deceased, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right for her loss of society and severe emotional distress.

14.     Plaintiff, WINNIE WANGUI KINYUA, is a citizen of Kenya and is the sister of MOSES MAGOTHE KINYUA, deceased, who was employed by the U.S. Government or was an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya. Plaintiff now brings this action in her own right for her loss of society and severe emotional distress.

15.     Plaintiff, MARTIN MUNGA NJERI, is a citizen of Kenya and is the informally adopted son and/or foster son of MOSES MAGOTHE KINYUA, who became his legal guardian after the death of Milcah Njeri, Martin's mother, and thereafter provided for Martin's welfare, took him into his home, and referred to Martin as his son. Plaintiff now brings this action in his own right for his loss of society and severe emotional distress.

**DEFENDANTS**

16.     Defendant, the **REPUBLIC OF THE SUDAN** (hereinafter referred to as "Sudan"), is a foreign state within the meaning of 28 U.S.C.  1391(f) and 1603(a).

17.     SUDAN has been designated as a foreign state that sponsors terrorism within the meaning of 28 U.S.C. § 1605A, the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371.

18.     SUDAN, through its officials, officers, agents and employees, provided material support and resources to Osama Bin Laden and Al Qaeda. The support provided by SUDAN to Osama Bin Laden and Al Qaeda assisted in or contributed to the preparation and execution of the plans that culminated in the U.S. Embassy bombing at Nairobi, Kenya, and the extrajudicial killing and/or injury of the Plaintiffs.

19.     The Defendant, the MINISTRY OF THE INTERIOR OF THE REPUBLIC OF THE SUDAN, is an agency of Defendant, the Republic of the Sudan.  Its activities at the time of this occurrence included the support of terrorist activities directed against foreign targets by terrorist groups operating with cover of the Republic of the Sudan.

20.     Defendant, the **ISLAMIC REPUBLIC OF IRAN** (hereinafter referred to as "Iran"), is a foreign state within the meaning of 28 U.S.C. §1391(f) and 1603(a).

21.     IRAN has been designated as a foreign state that sponsors terrorism within the meaning of 28 U.S.C. § 1605A, the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371.

22.     IRAN has been found to be liable as a state sponsor of international terrorism under 28 U.S.C. § 1605(a)(7), especially in connection with acts perpetrated by its state sponsored paramilitary terrorist organization known as "Hezbollah," in various cases before

this court, including *Anderson v. the Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000), and *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998).

23.    IRAN, through its officials, officers, agents and employees including the ISLAMIC REPUBLIC OF IRAN MINISTRY OF FOREIGN AFFAIRS, the IRANIAN MINISTRY OF INFORMATION AND SECURITY (MOIS), and the Iranian Revolutionary Guard Corps, provided material support and resources to Osama Bin Laden and Al Qaeda both directly and through its surrogate, Hezbollah. The support provided by IRAN to Osama Bin Laden and Al Qaeda assisted in or contributed to the preparation and execution of the plans that culminated in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, and the deaths and injuries caused by the bombing.

24.    Defendant, MOIS, is a political subdivision and/or agency of Defendant, the Islamic Republic of Iran.  Its activities at the time of the bombing included the support of terrorist activities directed against foreign targets by terrorist groups operating with cover of the Islamic Republic of Iran.

## **FACTS**

### A.  The History, Organization, and Function of Al Qaeda

25.    In or about 1989, Osama Bin Laden, Muhammad Atef, and others founded an international terrorist group that became known as "Al Qaeda" ("the Base"). Osama Bin Laden was the "emir" (prince) of Al Qaeda and was its leader at all relevant times. Members of Al Qaeda pledged an oath of allegiance (called a "bayat") to Osama Bin Laden and Al Qaeda.

26.    From 1989 until about 1991, Al Qaeda was headquartered in Afghanistan and in Peshawar, Pakistan. In or about 1991, the leadership of Al Qaeda, including Osama Bin

Laden, relocated to the Sudan. Al Qaeda was headquartered in the Sudan from approximately 1991 until approximately 1996 but also maintained offices in various parts of the world. In 1996, Osama Bin Laden and other members of Al Qaeda relocated to Afghanistan.

27.    Osama Bin Laden and Al Qaeda violently opposed the United States for several reasons. First, the United States was regarded as an "infidel" because it was not governed in a manner consistent with the group's extremist interpretation of Islam. Second, the United States was viewed as providing essential support for other "infidel" governments and institutions, particularly the governments of Saudi Arabia and Egypt, the nation of Israel, and the United Nations organization, which were regarded as enemies of the group. Third, Al Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, Al Qaeda opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) following the Gulf War. Fourth, Al Qaeda opposed the United States Government because of the arrest, conviction and imprisonment of persons belonging to Al Qaeda or its affiliated terrorist groups or those with whom it worked. For these and other reasons, Osama Bin Laden declared "jihad," or holy war, against the United States, which he had carried out through Al Qaeda and its affiliated organizations.

28.    Al Qaeda functioned both on its own and through some of the terrorist organizations that operated under its umbrella, including: Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, and at times, the Islamic Group (also known as "el Gamaa Islamia" or simply "Gamaa't"), and a number of jihad groups in other countries, including

the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyan region of Russia. Al Qaeda also maintained cells and personnel in a number of countries to facilitate its activities, including in Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

29.     Al Qaeda had a command and control structure which included a "majlis al shura" (or consultation council) which discussed and approved major undertakings, including terrorist operations.

30.     Al Qaeda had a "military committee" which considered and approved "military" matters.

31.     Osama Bin Laden and Al Qaeda also forged alliances with the National Islamic Front in the Sudan, with representatives of IRAN, and its associated terrorist group Hezbollah, and with representatives of the government of IRAQ for the purpose of working together against their perceived common enemy in the West, the United States.

32.     Since at least 1989, Osama Bin Laden and the terrorist group Al Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan.  Those camps were used to instruct members and associates of Al Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train others in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of Al Qaeda about traveling to perform

operations. For example, Al Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to determine the effectiveness of their terrorist activities.

33.     Since in or about 1996, Osama Bin Laden and others operated Al Qaeda from their headquarters in Afghanistan.  During this time, Osama Bin Laden and others forged close relations with the Taliban and Muhammad Omar in Afghanistan.  Osama Bin Laden openly informed other Al Qaeda members and associates outside Afghanistan of their support of, and alliance with, the Taliban and Muhammad Omar.

### B.  The "fatwahs" and the "jihad" Terrorist Campaign Against Americans

34.     One of the principal goals of Al Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) and Somalia by violence. These goals eventually evolved into a declaration of jihad against America and all Americans. Members of Al Qaeda issued "fatwahs" (rulings on Islamic law) indicating that such attacks on Americans were both proper and necessary.

35.     At various times from in or about 1992, Osama Bin Laden, working together with members of the fatwah committee of Al Qaeda, disseminated fatwahs to other members and associates of Al Qaeda.  These fatwahs directed that United States citizens should be attacked and murdered.

36.     On various occasions, Osama Bin Laden and other co-conspirators advised members of Al Qaeda that it was proper to engage in violent actions against "infidels" (nonbelievers), even if others might be killed by such actions, because if the others were "innocent," they would go to paradise, and if they were not "innocent," they deserved to die.

### C. The Sovereign Nation Defendants Furnished Critical Aid to Underwrite the Terrorist Conspiracy Against the United States

37.     In furtherance of the conspiracy, the named Defendants committed the following acts:

a.  At various times from at least as early as 1990, Defendants and their unknown co-conspirators provided military and intelligence training in various areas, including Afghanistan, Iraq, Iran, Pakistan, and the Sudan, for the use of Al Qaeda and its affiliated groups.

b.  At various times from at least as early as 1989, Defendants and others known and unknown engaged in financial and business transactions on behalf of Al Qaeda, including, but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of Al Qaeda and its associated terrorist organizations in various countries throughout the world.

c.  In the early 1990s, the government of the Sudan sent overtures to Osama Bin Laden and Al Qaeda, inviting the group to relocate en mass from Afghanistan to the Sudan. Jamal Ahmed Al-Fadl, a top Al Qaeda lieutenant who served Bin Laden in Afghanistan as well as the Sudan, learned of the impending relationship between Al Qaeda and the Sudanese government for the first time at one of the meetings in Peshwar, Pakistan that occurred between the Sudanese government, Bin Laden, and other Al Qaeda members. The representatives of the Sudanese government promised the support of that government should Al Qaeda come to the Sudan.  Al Qaeda hereafter used Sudanese Airways planes to ferry

anti-tank rockets and Stinger missiles from Afghanistan to the Sudan.

d.   The government of the Sudan is run by President Field Marshall Omar Hassan al-Bashir, the head of state of the Sudan, through an alliance of the military and the National Congress Party, formerly the National Islamic Front.

e.   Al-Fadl went to the Sudan to secure residential and commercial property for Al Qaeda.  The purpose of some of the property was to provide a safe place to train Al Qaeda militants.

f.   Essam Al Riddi, a pilot who worked for Bin Laden in 1993, stated that he purchased a plane for Bin Laden; oversaw its refurbishment; and flew it to Khartoum in 1993.

g.   While Al Riddi stayed in Khartoum, he dined with Bin Laden and had several discussions with him. Bin Laden was staying in a large villa in Khartoum, with an office and a guesthouse. The Sudanese government provided security for Al Qaeda. Fifteen (15) to twenty (20) Sudanese men dressed in Sudanese army fatigues, using jeeps with Sudanese army license plates, were stationed at the villa.

h.   Al Qaeda provided Al Riddi with a plane from Sudan Airlines to ferry militants to Nairobi.  Bin Laden discussed the possibility of Al Riddi transporting some Stinger missiles from Pakistan to the Sudan.

i.   Bin Laden assured Al Riddi that the Sudanese and Pakistani intelligence agencies would cooperate with the weapons transfer.

j.   The training that Al Qaeda employed in the Sudan included explosives training. The loud noises drew the local police after complaints from neighbors and Al Fadl was among those arrested.  He was quickly released, due to the close relationship between Al

Qaeda, and the Sudanese intelligence service, a Defendant in this action.  According to Al-Fadl:

> [W]e call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that.  And they take us to the jail, and they say you shouldn't do that, we tell you to refresh,[2] not to make real explosives.

k.   Al-Fadl saw a letter from President al-Bashir that explained the relationship between Al Qaeda  and Sudanese intelligence.  With the explicit approval of Bin Laden, Al-Fadl also personally worked with the Sudanese intelligence officers.

l.   The Sudanese intelligence officers and government officials, at all times, acted within the scope of their office or agency during the activities described in this Complaint.

m.   The intelligence officers were organized into a "delegation office" to meet the needs of the Al Qaeda group in the Sudan. There was an explicit fear that agents from foreign governments or informants would disclose Al Qaeda's location and activities in the Sudan. Some of these informants were consequently  jailed in the Sudan. Al-Fadl would identify suspicious foreigners to the Sudanese intelligence as Al Qaeda sought to keep its presence and activities in the Sudan secret.

n.   The delegation office, staffed with Sudanese intelligence officers, also helped provide security for Al Qaeda and facilitated the movement of weapons in and out of the country. On one particular trip, the weapons were taken out of the country by delivering four

---

[2]"Refresh" meant refresher courses for the militants who had already received training in the past.

crates of weapons to a hangar at a Sudanese military base, and then to a port facility owned by the Sudanese army.

o.   The letter from President al-Bashir was absolutely essential to the operations of the Al Qaeda terrorist group, which was secretly training in the Sudan. The letter allowed Al Qaeda members, such as Al-Fadl, to bypass tax and customs collection on international shipments and guaranteed their shipments, coming or going, would not be inspected.

p.   Weapons and explosive shipments moved through a quay protected by the Sudanese military in Port Sudan into a barracks used by Sudanese armored and mechanized infantry. The letter would allow shipments from overseas to bypass inspection at a port and then travel back to Khartoum without inspection by the local police at the numerous checkpoints along the way.

q.   The delegation office, the Sudanese government's go-between with Al Qaeda, also protected Al Qaeda members, such as Al-Fadl, from the interference of Sudanese immigration officials at the airport. This was important because if Al Qaeda members were caught abroad and their passports were stamped with Sudanese immigration markings, it would be clear to foreign agents where the organization was located.

r.   Al Qaeda also set up a number of companies that provided it with critical income so that it could continue its growth and evolution into a lethal organization with global reach. However, Al Qaeda did not come to Sudan to operate as a regular capitalist enterprise. Rather, the purpose of the investment in Sudanese business activity was as an adjunct to its mission of aggression against the West, as explicitly stated by Bin Laden himself:

. . . [O]ur agenda is bigger than business.  We not going to make business here, but we

need to help the government and the government help our group, and this our purpose.

s.   Among the Sudanese companies founded by Al Qaeda were: Laden International Company for import and export; Taba Investment for currency exchange; Hijra Construction Company, which built the largest road existing in Sudan; and the Al Themar al Mubaraka, which ran the farm where Al Qaeda trained its militants in explosives. The  Hijra Construction Company purchased explosives for its road and bridge building activities.

t.   Al Qaeda also had extensive holdings in Khartoum, including business offices, guesthouses, farms and residential houses. Bin Laden even had a bank account in Khartoum in his true name. Al Qaeda purchased some of the companies directly from the Sudanese government. The funding that these companies provided to Al Qaeda was critical to its survival and continued existence. At a meeting, which included Bin Laden, the fluctuation of Sudanese currency caused great concern as most of Al Qaeda's income was derived from this business activity.

u.   Al Qaeda's position regarding the United States was clear as early as 1992, when Bin Laden issued a fatwa against the United States due to its presence in the Gulf region during the First Gulf War and its actions in Somalia. The discussion surrounding the fatwa included an explicit allowance for the murder of innocent civilians. Al Qaeda provided support to groups in Somalia, Yemen, the Philippines, Tajikistan, and Pakistan, among others.

v.   The partnership forged with the Sudanese government derived benefits for both parties. The Sudanese government employed Al Qaeda to manufacture chemical weapons in a section of Khartoum, called Hilat Koko, for use against the rebels in southern Sudan. Al-Fadl traveled to the chemical weapons manufacturing area with a Sudanese military officer, who

explained the need for chemical weapons by the Sudanese government.

w.  Al Qaeda also provided communications equipment and Kalishnikov rifles for the Sudanese army, founded by the Islamic National Front, to fight the Christian rebels in the south. Al-Fadl, as part of this arrangement, also worked directly for the Sudanese government. For example, a Sudanese intelligence officer who also worked in the immigration office approached Al-Fadl and asked him to spy on a government opposition  leader. Al-Fadl arrested the opposition leader and tried to turn him away from his work against the Sudanese government. The Sudanese intelligence officer advised Al-Fadl to lie to the opposition leader, to tell him that Al-Fadl had quit Al Qaeda and had stopped working with the government. Al-Fadl reported back to the head of the delegation office; the group of Sudanese intelligence officers that protected Al Qaeda, facilitated communications with the Sudanese government, and provided logistical support.

x.  Dr. Abdullah Mohamed Yusef, a member of the Islamic National Front, through which President al-Bashir ran the Sudanese government, organized travel, documents and funneled economic aid to Al Qaeda while it was located in the Sudan.

y.  Al Qaeda entered into a transaction to purchase uranium through the former President of the Sudan, currently an officer in the Sudanese army. The quality of the uranium was tested in Hilat Koko, the section of Khartoum where the government was partnered with Al Qaeda  in the manufacture of chemical weapons. Al-Fadl discussed the uranium test with a member of the Sudanese government, whose brother "runs" the building where the chemical weapon manufacture was housed.

z.  Without the material support, assistance, and aid provided by Sudanese government officials acting within the scope of their agency, employment or office, Al Qaeda could not

have carried out the United States embassy bombing at Nairobi, Kenya that caused Plaintiffs' injuries. Such material support, assistance, and aid fits within the definition of material support as described by 18 U.S.C. § 2339A.

aa. The Defendants not only knew that Al Qaeda was attempting to conceal itself in the Sudan, but facilitated and furthered Al Qaeda's concealment through the activities of the Sudanese intelligence services. The scale of support that Defendants furnished Al Qaeda was substantial.  The regime invited Al Qaeda to roost in the Sudan and knew of, at least from 1992 onward, Al Qaeda's anti-US crusade.

bb. The then and current regime of Sudan explicitly allied itself with Al Qaeda for an illegal and unlawful purpose. The regime conspired with Al Qaeda in the manufacture of weapons and training of terrorists, all the while knowing of Al Qaeda's anti-US crusade. The provision of support to a terrorist organization is illegal and unlawful. The explicit purpose of their agreement was to make each stronger. The U.S. Embassy bombing at Nairobi, Kenya greatly enhanced Al Qaeda's worldwide reputation and attracted money, recruits and support from those allied against the United States.

cc. At various times from at least 1990, IRAN has provided material support to Osama Bin Laden and Al Qaeda, often through its state-sponsored terrorist organization, Hezbollah. That support included advice and assistance in planning attacks against American targets. Information was often shared and exchanged between Al Qaeda and IRAN.

dd. For many years, the Department of State has included IRAN among the *"state sponsors of terrorism."* Indeed, more than once in recent years, the Department of State has described IRAN as *"the most active"* among state sponsors of terrorism. The formation of Hezbollah and its emergence as a major terrorist organization was the product

of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards and the Iranian Ministry of Information. The above referred to activities of Hezbollah were financed, technologically supported and commanded by Iranian military/intelligence operatives.

ee. In October 2001, an Osama Bin Laden operative, Ali Mohamed, confessed in Federal District Court in New York that he and senior Bin Laden operatives had met with Hezbollah security chief Imad Mughniyah who is believed to have carried out the bombings of the U.S. Embassy in Beirut and the Marine barracks in 1983.

ff. On many occasions, Bin Laden had praised the 1983 Beirut Marine barracks bombing conducted by Hezbollah and Iranian agents. Bin Laden sought out Hezbollah and their Iranian commanders for their tactical expertise for large scale operations. In 1993-1994, Al Qaeda operatives received specialized-explosives training in Lebanon from Hezbollah operatives.

gg. In June 1996, Iran's Ministry of Information and Security hosted a meeting of terrorist leaders in Tehran that included Imad Mughniyah and senior aides to Osama Bin Laden. Senior aides to Osama Bin Laden subsequently met with Mughniyah on several occasions.

hh. The purpose of the meetings between Bin Laden, Al Qaeda, Hezbollah operatives, and Iranian agents was to share information on how to build a technologically advanced bomb that could destroy a building. Al Qaeda did not have the know-how, prior to its contacts with Hezbollah operatives and Iranian agents, to conduct the 1998 U.S. Embassy bombing at Nairobi, Kenya.

ii. Based on evidence developed in connection with the war in Afghanistan, senior officials in the U.S. Government, including Secretary of Defense Donald Rumsfeld, believe that

Al Qaeda and Taliban members have now taken refuge in IRAN.

38.     The officials, agents, and employees of the foreign sovereign Defendants were acting within the scope of their agency, office or employment when they provided support to the terrorists and terrorist group that destroyed the U.S. Embassy at Nairobi, Kenya. They did so because, for various reasons, it was the policy of their respective governments to aid Al Qaeda.

### D.  The Events Leading Up to the Embassy Bombing in Nairobi, Kenya

39.     In or about 1994, Mohamed Sadeek Odeh moved to Mombassa, Kenya, to set up businesses with Al Qaeda money which was used to support Al Qaeda members in Kenya. While in Kenya, Odeh was visited by Muhammed Atef, the military commander of Al Qaeda.

40.     In or about 1994, Wadih El Hage moved to Nairobi, Kenya, and established businesses and other organizations (*e.g.*, "Help Africa People") in Kenya. While in Kenya, Wadih El Hage met repeatedly with one of Al Qaeda's military commanders, the late Abu Ubaidah al Banshiri.

41.     On or about October 25, 1994, Khalid Al Fawwaz, a member of Al Qaeda, transferred the Kenyan business "Asma Limited" to the late Abu Ubaidah al Banshiri.

42.     In or about 1996, in Mombasa, Kenya, Fahid Ali Msalam, a member of Al Qaeda, displayed explosives and detonators obtained in Tanzania to Mohamed Sadeek Odeh.

43.     Beginning in the latter part of 1993, Anas Al Liby and other members of Al Qaeda began contemplating an attack against the U.S. Embassy in Nairobi, Kenya, in retaliation for the United States' participation in Operation Restore Hope in Somalia.

44.      In or about the latter part of 1993, Anas Al Liby and others conducted a visual and photographic surveillance of the U.S. Embassy at Nairobi, Kenya.

45.      In or about 1994, Anas Al Liby, together with other members of Al Qaeda reviewed files concerning possible terrorist attacks against: (i) the U.S. Embassy at Nairobi, Kenya; (ii) the building then housing the U.S. Agency for International Development in Nairobi, Kenya; and (iii) British, French and Israeli targets in Nairobi, Kenya.

46.      In or about 1994, members of Al Qaeda also contemplated possible terrorist attacks against targets in various countries other than Kenya.

47.      In or about 1994, Khalfan Khamis Mohamed traveled to an Al Qaeda camp in Afghanistan where he received training in explosives.

48.      Beginning in or about 1996, Mohamed Rashed Daoud Al-'Owhali traveled to an Al Qaeda camp in Afghanistan where he received training in explosives, hijacking, kidnapping, assassination and intelligence techniques.

49.      In or about 1996, following his training in a number of camps in Afghanistan affiliated with Al Qaeda, Mohamed Rashed Daoud Al-'Owhali met with Osama Bin Laden and asked him for a "mission."

50.      In late February or early March 1997, Wadih El Hage, met and spoke with Mustafa Mohamed Fadhil, a member of Al Qaeda, and provided him with a new policy from Osama Bin Laden to militarize the East African cell of Al Qaeda.

51.      On or about June 23, 1997, Wadih El Hage requested that $10,000 be transferred to an account in Kenya.  On or about July 3, 1997, this money was transferred to an account in Kenya controlled by Wadih El Hage.

52.     In or about May 1998, Fazul Abdullah Mohamed, a member of Al Qaeda, rented a villa at 43 New Runda Estates in Nairobi, Kenya.

53.     In or about June 1998, Mohamed Rashed Daoud Al-'Owhali, and an individual known as "Azzam" filmed a videotape to celebrate their anticipated "martyrdom" in a bombing operation to be conducted against United States interests in East Africa.

54.     On or about June 19, 1998, "Azzam," using a passport in the name of "Gihad Ali," traveled from Karachi, Pakistan, to Nairobi, Kenya.

55.     In or about late June or early July 1998, Fahid Ali Msalam and Sheikh Ahmed Salim Swedan, a member of Al Qaeda, purchased a Toyota Dyna truck ("the Nairobi Bomb Truck") in Mombasa, Kenya, and made alterations to the back of the truck.

56.     On or about July 31, 1998, Mohamed Rashed Daoud Al-'Owhali, using a passport in the alias "Khaled Salem Saleh Bin Rashed," traveled from Karachi, Pakistan, to Nairobi, Kenya, arriving on August 2, 1998.

57.     On or about August 1, 1998, Abdullah Ahmed Abdullah, a member of Al Qaeda, advised Mohamed Sadeek Odeh that all members of Al Qaeda had to leave Kenya by Thursday, August 6, 1998.

58.     In or about early August 1998, Abdullah Ahmed Abdullah and Mohamed Sadeek Odeh traveled from Mombasa, Kenya, to Nairobi, Kenya.

59.     During the first week of August 1998, Abdullah Ahmed Abdullah, Fazul Abdullah Mohammed, and Mohamed Rashed Daoud Al-'Owhali, together with "Azzam" and other members of Al Qaeda, met at the villa located at number 43 New Runda Estates in Nairobi, Kenya, to make final preparations for the bombing of the U.S. Embassy at

Nairobi, Kenya.

60.     On or about August 1, 1998, Ahmed Khalfan Ghailani checked into the Hilltop Hotel in Nairobi, Kenya.  On or about August 2, 1998, Mohamed Sadeek Odeh and Fazul Abdullah Mohammed, together with other members of Al Qaeda, met at the Hilltop Hotel in Nairobi, Kenya.

61.     On or about August 2, 1998, Sheikh Ahmed Salim Swedan and Mustafa Mohamed Fadhil left Nairobi, Kenya, for Karachi, Pakistan.

62.     On or about August 3, 1998, Fahid Ali Msalam purchased air travel tickets to Pakistan for himself and Mohamed Sadeek Odeh.

63.     On or about August 4, 1998, Abdullah Ahmed Abdullah, Fazul Abdullah Mohammed and Mohamed Rashed Daoud Al-'Owhali, together with "Azzam" and other members of Al Qaeda, reconnoitered the U.S. Embassy at Nairobi, Kenya.

64.     On or about August 6, 1998, Abdullah Ahmed Abdullah and Ahmed Khalfan Ghailani left Nairobi, Kenya, for Karachi, Pakistan.

65.     On or about August 6, 1998, Mohamed Sadeek Odeh and Fahid Ali Msalam left Nairobi, Kenya, for Karachi, Pakistan.

**E.  The Bombing at the U.S. Embassy in Nairobi, Kenya**

66.     On August 7, 1998, at approximately 9:30 a.m. local time, Fazul Abdullah Mohammed drove a pick-up truck from the villa located at 43 New Runda Estates to the vicinity of the U.S. Embassy in Nairobi, Kenya.  Meanwhile, Mohamed Rashed Daoud Al-'Owhali rode in the Nairobi Bomb Truck driven by "Azzam" (a Saudi national) containing a large bomb to the U.S. Embassy at Nairobi, Kenya.  Mohamed Rashed Daoud Al-'Owhali possessed four stun-type grenades, a handgun, bullets, and keys to the padlocks on the

Nairobi bomb truck.

67.     On August 7, 1998, at approximately 10:30 a.m., Mohamed Rashed Daoud Al-'Owhali got out of the Nairobi bomb truck as it approached the rear of the U.S. Embassy building and threw a stun grenade in the direction of a security guard before attempting to flee.

68.     On August 7, 1998, at approximately 10:30 a.m., "Azzam" drove the Nairobi bomb truck to the rear of the U.S. Embassy building and fired a handgun at the windows of the Embassy building.

69.     On August 7, 1998, at approximately 10:30 a.m., "Azzam" detonated the explosive device contained in the Nairobi bomb truck at a location near the rear of the Embassy building, demolishing a multi-story secretarial college and severely damaging the U.S. Embassy building and the Cooperative Bank Building, causing a total of more than 213 deaths, as well as injuries to more than 4,500 people, including Plaintiffs.

70.     The actions of the agents and co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, as set forth above, inflicted mental distress upon the Plaintiffs. The material support rendered to co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, fits within the definition of material support as described by 18 U.S.C. § 2339 (A).

71.     The formation of Hezbollah and its emergence as a terrorist organization was the product of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards, the Quds Force and the Iranian Ministry of Information. Al Qaeda was financed, technologically supported and/or commanded by Iranian military and intelligence operatives, including Hezbollah.

## CAUSES OF ACTION

## COUNT I

## CLAIM OF ALL PLAINTIFFS

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OR SOLATIUM

(Under 28 U.S.C. § 1605A(c), U.S. state common law, Kenyan common law)

72.     Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

73.     All Defendants knew that the U.S. Embassy bombing at Nairobi, Kenya would kill or injure innocent United States Plaintiffs and foreign Plaintiffs at their place of work, leaving family members to grieve for their loss.

74.     As a direct and intended consequence of the intentional and reckless actions of the Defendants, conduct that is intolerable in a civilized society, the Defendants, their co-conspirators and those who were substantially aided and abetted by Defendants, who carried out the attacks above alleged, caused the surviving Plaintiffs, severe mental distress, which has required continuing treatment, which will continue for the balance of Plaintiffs' lives, and they have thereby suffered damages.

75.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will forever in the future suffer severe and permanent emotional distress and anxiety, permanent psychological distress and permanent mental impairment.

76.     The conduct of all Defendants was undertaken in an intentional manner to injure the Plaintiffs and to cause the contemporaneous and permanent emotional suffering of the immediate family members of Moses Magothe Kinyua.

77.     As a direct and proximate result of the death of Moses Magothe Kinyua, his

immediate family members have been deprived of his society, future aid, assistance, services, comfort, and financial support.

78.     As a direct and proximate result of the Defendants' cowardly, barbaric and outrageous act of murder, the immediate family members of Moses Magothe Kinyua will forever grieve his death.

79.     The Defendants, by engaging in this unlawful conduct, recklessly and/or intentionally inflicted severe emotional distress upon the Plaintiffs.

## COUNT II

## CLAIM OF ALL PLAINTIFFS

## AIDING AND ABETTING

(Under 28 U.S.C. § 1605A(c), U.S. state common law, Kenyan common law)

80.     Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

81.     Defendants did knowingly and willfully provide substantial assistance to the terrorists and the terrorist organization that willfully and deliberately committed the embassy bombing in Nairobi, Kenya, which caused the injuries of the plaintiffs. All Defendants were aware of the goals of Al Qaeda  and were aware or should have been aware that the aid and assistance furnished to Al Qaeda would aid and abet Al Qaeda's terrorist activities, including the US embassy bombing at Nairobi, Kenya.

82.     For the reasons stated above, and having aided and abetted a terrorist organization which willfully and deliberately committed an act of terrorism which caused the injuries of the plaintiffs, all defendants are jointly and severally liable to plaintiffs for all damages in this civil action.

## COUNT III

## CLAIM OF ALL PLAINTIFFS

## CIVIL CONSPIRACY

(Under 28 U.S.C. § 1605A(c), U.S. state common law, Kenyan common law)

83.     Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

84.     As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly to inflict personal injuries upon the Plaintiffs.

85.     As set forth above, all Defendants conspired and agreed to provide material support and resources to Al Qaeda and the bombers, in furtherance of Al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the U.S. Embassy in Nairobi, Kenya.

86.     The Defendants' conspiracy resulted in the August 7, 1998 Embassy attack that inflicted personal injuries upon the Plaintiffs.

87.     As a result of the Defendants' conspiracy, Plaintiffs suffered damages as fully set forth in the paragraphs above and incorporated herein by reference.

## COUNT IV

## CLAIM OF ALL PLAINTIFFS

## PUNITIVE DAMAGES

(Under 28 U.S.C. § 1605A(c))

88.     Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth herein.

89.     As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to inflict personal injuries upon the Plaintiffs.

90.     As set forth above, all Defendants conspired and agreed to provide material support and resources to Al Qaeda, and the bombers, in furtherance of Al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the U.S. Embassy in Nairobi, Kenya.

91.     The Defendants' conspiracy resulted in the August 7, 1998 Embassy attack that inflicted personal injuries upon the Plaintiffs.

92.     Defendants' outrageous actions cannot be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

93.     As a result of the Defendants' conspiracy, Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

## DAMAGES

94.     As a direct and proximate result of the intentional, willful, reckless, and careless actions of the Defendants, Plaintiffs have suffered severe and permanent personal injuries, damages, and losses, including the following:

(a) the severe mental anguish suffered by Plaintiffs;

(b) the severe pain and suffering suffered by Plaintiffs;

(c) loss of Plaintiffs' life's pleasures; and

(d) economic damages, solatium, pain and suffering, and punitive damages under 28 U.S.C. § 1605A(c).

95.     The aforementioned personal injuries and losses incurred by the Plaintiffs were

caused by the intentional outrageous acts, recklessness, and carelessness of all Defendants, acting individually and in concert, as well as other co-conspirators not yet identified, and of their agents, servants and/or employees acting within and during the course and scope of their employment, authority, or apparent authority.

96.     These aggravating circumstances also justify the award of exemplary damages to the non-U.S. national Plaintiffs under Kenyan law.

97.     Plaintiffs demand judgment in their favor in general damages against all Defendants, jointly, severally, and *in solido*, in an amount in excess of Three Hundred and Seventy Five Million ($375,000,000) Dollars.

98.     Plaintiffs also request an award of legal interest, costs, and such other relief as this Honorable Court deems appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that the Court grant judgment in their favor and against the Defendants, jointly, severally, and *in solido* on Counts One through Four, and grant to Plaintiffs:

(a)     Compensatory and punitive damages in favor of Plaintiffs and against Defendants jointly, severally, and *in solido,* in the amounts demanded in this Complaint for Damages;

(b)     Prejudgment interest or other appropriate interest;

(c)     Costs and expenses;

(d)     Attorney's fees; and

(e)     Such other and further relief as this Honorable Court may determine to be just and appropriate under the circumstances.

Respectfully submitted this 15th day of December 2014.

                                    Respectfully submitted,

December 15, 2014          By:    /S/ Nazareth M. Haysbert
                                  _____
                                  Nazareth M. Haysbert (SBN 294431)
                                  HAYSBERT MOULTRIE, LLP
                                  700 South Flower Street, 11th Floor
                                  Los Angeles, CA 90017
                                  (310) 704-7233
                                  (757) 728-6253 Fax
                                  Nazareth@haysbertmoultrie.com
                                  *Pro Hac Vice* Admission Pending


                           By:    /S/ Raymond P. Boucher
                                  _____
                                  Raymond P. Boucher (SBN 115364)
                                  BOUCHER LLP
                                  21600 Oxnard Street, Suite 600
                                  Woodland Hills, CA 91367
                                  (818) 340-5400
                                  (818) 340-5401 Fax
                                  ray@boucher.la
                                  *Pro Hac Vice* Admission Pending


                           By:    /S/ Daniel S. Ward
                                  _____
                                  Daniel S. Ward (DC Bar # 474339)
                                  WARD & WARD, P.L.L.C.
                                  2020 N Street, NW
                                  Washington, DC 20036
                                  (202) 331-8160
                                  dan@wardlawdc.com