UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GEOFREY GITHUI KINYUA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**REPUBLIC OF THE SUDAN, et al.,**<br><br>Defendants. | Civil Action No. 14-2118 (JDB) |

### MEMORANDUM OPINION

Over twenty years ago, suicide bombers attacked the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, killing hundreds and leaving thousands of other victims injured. In one of the numerous cases arising out of these terrorist attacks, plaintiffs are seven family members of a worker at the U.S. embassy in Nairobi who was severely injured in the bombing. After five years of litigation, plaintiffs now move for default judgment against the Islamic Republic of Iran and the Iranian Ministry of Information and Security (collectively, the "Iranian defendants"). For the reasons explained below, the Court will grant plaintiffs' motion.

### Background

The Court assumes familiarity with the facts of this case as rehearsed in its prior opinions, see Sheikh v. Republic of Sudan, Civil Action No. 14-2090 (JDB), 2018 WL 1567578 (D.D.C. Mar. 30, 2018); Sheikh v. Republic of Sudan, 172 F. Supp. 3d 124 (D.D.C. 2016), as well as the broader litigation arising out of the August 7, 1998 bombing of the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, see, e.g., Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 135–46 (D.D.C. 2011). Plaintiffs are family members of Moses Kinyua, an employee of the U.S Embassy in Nairobi who was working on August 7, 1998, and was severely injured in the bombing.

Invoking jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), they filed this lawsuit in December 2014, alleging that Sudan, Iran, and the countries' respective agencies were liable for plaintiffs' emotional distress and other injuries.  See Compl. [ECF No. 1] ¶¶ 72–98.

Sudan challenged plaintiffs' claims as untimely and, on March 24, 2016, the Court dismissed plaintiffs' claims against the Sudanese defendants as beyond the FSIA's statute of limitations.  See Mar. 24, 2016 Order [ECF No. 29].  Iran, on the other hand, never appeared in court.  After receiving briefing from plaintiffs on whether the statute of limitations should bar their remaining claims, the Court set aside the defaults and dismissed plaintiffs' claims against the Iranian defendants as untimely.  See Maalouf v. Islamic Republic of Iran, 306 F. Supp. 3d 203, 213 (D.D.C. 2018).  The D.C. Circuit reversed, holding that this Court "lack[ed] authority to sua sponte raise a forfeited statute of limitations defense in an FSIA terrorism exception case, at least where the defendant sovereign fails to appear."  Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1101 (D.C. Cir. 2019).

On remand, and because Iran has still never appeared in this litigation, the Court turned to the merits of plaintiffs' claims and appointed a special master "to consider all issues relating to standing and compensating damages for each plaintiff's claims."  Order Adopting Administrative Plan [ECF No. 53] at 3; see also Order Appointing Special Masters [ECF No. 54] at 2–3.  In light of the special master's report, see R. & R. of Special Master Deborah Greenspan Regarding Damages Claims Asserted by Pls. ("Greenspan R. & R.") [ECF No. 57] at 1, plaintiffs filed a motion for default judgment against the Iranian defendants, see Pls.' Mot. for Entry of Default J. on Liability & Damages ("Pls.' Mot.") [ECF No. 60] at 1, to which the Court now turns.

## Legal Standard

The FSIA, 28 U.S.C. §§ 1602–1611, provides the "sole basis for obtaining jurisdiction over a foreign state in our courts."  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428,

434 (1989). While foreign states are generally immune from the jurisdiction of U.S. courts, see Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); see also 28 U.S.C. § 1604, the FSIA provides for federal court jurisdiction over foreign entities under a limited set of exceptions. Subject matter jurisdiction exists if the defendant's conduct falls within one of those specific statutory exceptions. See id. §§ 1330(a), 1604. Conversely, "if no exception applies, the district court has no jurisdiction." Odhiambo v. Republic of Kenya, 764 F.3d 31, 34 (D.C. Cir. 2014). Plaintiffs invoking one of these exceptions must establish jurisdiction by a preponderance of the evidence. See Gordon v. Office of the Architect of the Capitol, 750 F. Supp. 2d 82, 87 (D.D.C. 2010).

One such statutory exception, set forth in 28 U.S.C § 1605A, waives sovereign immunity in cases concerning a "state sponsor of terrorism." That exception affords subject matter jurisdiction in cases where "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" when such actions are taken "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." Id. § 1605A(a)(1).

Courts may exercise personal jurisdiction over a foreign state where the defendant is properly served in accordance with 28 U.S.C. § 1608. Owens, 826 F. Supp. 2d at 148; see also 28 U.S.C. § 1330(b). "Once jurisdiction has been established over plaintiffs' claims against all defendants, liability on those claims in a default judgment case is established by the same evidence if 'satisfactory to the Court.'" Owens, 826 F. Supp. 2d at 151 (quoting 28 U.S.C § 1608(e)). Satisfactory evidence includes sworn affidavits or declarations, prior judicial fact-findings, and other documents submitted in accordance with the Federal Rules of Evidence. See Bathiard v. Islamic Republic of Iran, Case No. 1:16-cv-1549 (CRC), 2019 WL 3412983, at *5 (D.D.C. July 29, 2019); Bodoff v. Islamic

Republic of Iran, 424 F. Supp. 2d 74, 78 (D.D.C. 2006). "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." Owens v. Republic of Sudan, 864 F.3d 751, 785–86 (D.C. Cir. 2017).

## Analysis

### I. Jurisdiction

The Court begins by considering whether it has subject matter jurisdiction over this dispute and personal jurisdiction over the Iranian defendants. The Court concludes that plaintiffs have satisfactorily established both forms of jurisdiction.

To start, plaintiffs have demonstrated by a preponderance of the evidence that Iran qualifies under the "state sponsor of terrorism" exception set forth in § 1605A. In relevant part, the exception covers cases seeking damages "for personal injury or death that was caused by . . . the provision of material support or resources" for "extrajudicial killing," if such aid was provided by "an official, employee, or agent of [a] foreign state while acting within the scope of his or her office." 28 U.S.C. § 1605A(a). In order to come within the exception, the foreign state must have been "designated as a state sponsor of terrorism at the time" of the terrorist attack or "so designated as a result of [the] act" and remain so designated at the time of the lawsuit. Id. § 1605A(a)(2)(A)(i)(I). The claimant or victim must also have been either a U.S. national, a member of the armed services, or "otherwise an employee of the Government of the United States" or a government contractor, at the time of the tortious act. Id. § 1605A(a)(2)(A)(ii).

Plaintiffs satisfy each of these requirements. First, "Iran was formally declared a 'state sponsor of terrorism' on January 19, 1984, by U.S. Secretary of State George P. Schultz . . . , and remains designated as a state sponsor of terrorism." Estate of Doe v. Islamic Republic of Iran, 808

F. Supp. 2d 1, 13–14 (D.D.C. 2011).  Second, the Court takes judicial notice and adopts the facts and conclusions of law set forth in its prior opinions concluding that the Iranian defendants provided "material support" to aid the 1998 bombing of the U.S. Embassy in Nairobi, Kenya.  See Owens, 826 F. Supp. 2d at 148–51.  The Court has also previously determined that plaintiffs' relative, Moses Kinyua, "was injured in the blast at the United States Embassy in Nairobi" and endured severe injuries:

> The blast knocked him into a coma for three weeks.  His skull was crushed, his jaw was fractured in four places, and he lost his left eye.  The head trauma resulted in brain damage.  In addition, he suffered from a ruptured eardrum, a detached retina in his right eye, a dislocated shoulder, broken fingers, and serious shrapnel injuries.  He was ultimately hospitalized for over six months.

Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 93–94 (D.D.C. 2014) (citations omitted), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017).  Plaintiffs' claims against the Iranian defendants for intentional infliction of emotional distress and other damages arise out of the same "material[ly] support[ed]" attack.  See 28 U.S.C. § 1605A(a)(1).  Finally, plaintiffs satisfy the eligibility requirements of § 1605A(a)(2)(A)(ii) because, at the time of the attacks, they were related to a U.S. Government employee, namely, Moses Kinyua.  See Greenspan R. & R. at 7.

The Court also has personal jurisdiction over the Iranian defendants.  "A foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608."  Fed. R. Civ. P. 4(j)(1).  Section 1608(a) sets forth four methods, in descending order of preference, for serving a foreign state, and plaintiffs must attempt service by each more preferred method, or conclude that such a method is impracticable, before proceeding to the next method.  See Doe, 808 F. Supp. 2d at 12.  The first two methods are inapplicable in lawsuits against Iran because no "special arrangement for service" exists between the United States and Iran, 28 U.S.C.

§ 1608(a)(1), and Iran is not a party to any "international convention on service of judicial documents," id. § 1608(a)(2). Aceto v. Islamic Republic of Iran, No. CV 19-464 (BAH), 2020 WL 619925, at *14 (D.D.C. Feb. 7, 2020). Because "many attempts at service by mail or courier on Iran are unsuccessful," plaintiffs instead resorted to the fourth method of service: sending their papers via diplomatic channels. See Request for Service of Process on Def. Islamic Republic of Iran & the Iranian Ministry of Information and Security ("Request for Service") [ECF No. 9] at 1; see also 28 U.S.C. § 1608(a)(4); Maalouf v. Islamic Republic of Iran, Civil Action No. 16-0280 (JDB), 2020 WL 805726, at *3 (D.D.C. Feb. 18, 2020) ("Plaintiffs . . . reasonably concluded that service by mail on Iran and its agencies under 28 U.S.C. § 1608(a)(3) would be futile as it is known to be ineffective." (internal quotation marks omitted)).

On April 3, 2015, plaintiffs requested that the Clerk of the Court effect service on the Iranian defendants under § 1608(a)(4) by transmitting the proper documents to the U.S. Department of State for diplomatic service. Request for Service at 1. On July 8, 2015, the U.S. Department of State informed the Court that service had been properly effected on the Iranian defendants on June 2, 2015. Return of Service [ECF No. 16] at 1. After more than sixty days elapsed, plaintiffs moved for entry of default, see Pls.' Mot. for Entry of Default [ECF No. 25] at 1–2, and the Clerk entered a default on October 29, 2015, see Default [ECF No. 26] at 1.

The Court thus has subject matter jurisdiction and personal jurisdiction under the FSIA because the case falls within the "state sponsor of terrorism" exception of § 1605A and service on the defaulted Iranian defendants was proper. And because Iran has still failed to appear, the Court accordingly reinstates the default that it previously set aside. See Sheikh v. Republic of Sudan, 308 F. Supp. 3d 46, 48 (D.D.C. 2018).

## II.     Iran's Liability for the 1998 Nairobi Embassy Bombing

The Court next turns to the Iranian defendants' liability for plaintiffs' injuries arising out of the attack on the U.S. Embassy in Nairobi on August 7, 1998.  Because plaintiffs are all citizens of Kenya, see Greenspan R. & R. at 2–3; Compl. ¶¶ 9–15, and do not fall into the other categories specified in § 1605A(c), they cannot rely on a federal cause of action for their suit.  Nevertheless, they may pursue their claims under applicable state and/or foreign law.  See Owens, 826 F. Supp. 2d at 153–57; Doe, 808 F. Supp. 2d at 19–20.  "[L]iability in a default judgment case is established by the same evidence [used to establish jurisdiction] if 'satisfactory to the [c]ourt.'"  Doe, 808 F. Supp. 2d at 17–18 (quoting 28 U.S.C. § 1608(e)).  The "satisfactory" evidence standard can be met through "uncontroverted factual allegations" supported by "document and affidavit evidence."  Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 59 (D.D.C. 2010).  A court may also "take judicial notice of any fact 'not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,'" including facts established in related proceedings and other court records.  Id. (quoting Fed. R. Evid. 201(b)).

As noted above, much of the same evidence that established Iran's liability in previous cases will again serve as the basis for evaluating liability here.  In addition, and as the Court has previously done, the Court will rely on the special master report prepared by Deborah Greenspan based on sworn testimony and statements, medical records, and other documentary evidence.  See Greenspan R. & R. at 1–2; see also Amduso v. Republic of Sudan, 61 F. Supp. 3d 42, 46 (D.D.C. 2014) (adopting "all facts found by the special masters"), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017).

In their complaint, plaintiffs allege three claims against the Iranian defendants "[u]nder 28 U.S.C. § 1605A(c), U.S. state common law, [and] Kenyan common law," Compl. at 25–27:

7

(1) intentional infliction of emotional distress, id. ¶¶ 72–79; (2) aiding and abetting, id. ¶¶ 80–82; and (3) civil conspiracy, id. ¶¶ 83–87. They have now narrowed their suit to a claim of intentional infliction of emotional distress under D.C. law. See Pls.' Mot. at 10; see also Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 840 (D.C. Cir. 2009) (requiring plaintiffs "to identify the specific source of law" by "an appropriate time in the litigation," even if not in the complaint). In order to prevail on that claim, "a plaintiff must show: (1) extreme and outrageous conduct on the part of the defendant which, (2) either intentionally or recklessly, (3) causes the plaintiff severe emotional distress." Opati v. Republic of Sudan, 60 F. Supp. 3d 68, 76 (D.D.C. 2014). "The scope of recovery under this theory is limited by two qualifications: the plaintiff must be 'a member of [the injured person's] immediate family' and must be 'present at the time.'" Oveissi v. Islamic Republic of Iran ("Oveissi II"), 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (quoting Restatement (Second) of Torts § 46(2)(a)–(b)). In the case of terrorism, however, "[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); see also Republic of Sudan v. Owens, 194 A.3d 38, 44 (D.C. 2018) (concluding that, under D.C. law, "when § 1605A applies, the need for the presence requirement does not"). Thus, if plaintiffs can establish that they are members of the injured victim's immediate family, they also satisfy the presence requirement.

Building on the Court's prior awards to Moses Kinyua's wife and children, plaintiffs establish each of the requisite elements for their intentional infliction of emotional distress claim. See Wamai, 60 F. Supp. 3d at 89–90. As the Court observed in 2014, "[a]cts of terrorism 'by their very definition' amount to extreme and outrageous conduct," id. at 90 (quoting Valore, 700 F. Supp. 2d at 77), and the Iranian defendants "acted intentionally and recklessly" in their support and funding of the attacks on the embassy, id. The Court also determined that the Iranian defendants' "actions caused . . . severe

emotional distress" both to the victims at the scene of the bombing and to their immediate families. Id.; see also Owens, 826 F. Supp. 2d at 136–45; Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 74–75 (D.D.C. 2010). Based on these conclusions, as well as Moses's physical injuries, the Court awarded Moses Kinyua $7,500,000 in pain and suffering damages and his wife and son separate awards for solatium damages. See July 25, 2014 Order, Wamai v. Republic of Sudan, Civil Action No. 08-1349 (JDB) at 4 (D.D.C. 2014), ECF No. 245 (Moses's damages award); July 25, 2014 Order, Opati v. Republic of Sudan, Civil Action No. 12-1224 (JDB) at 6 (D.D.C. 2014), ECF No. 44 (family's damages awards).

Like Moses's wife and son, the seven plaintiffs in this lawsuit—Geofrey Githui Kinyua, Edward Ngatia Kinyua, Joseph Wachira Kinyua, Susan Wanjugu Wachira, Mary Wanjiru Kinyua, Winfred Wangui Kinyua, and Martin Munga Njeri—are all immediate family members of Moses Kinyua asserting a claim for damages based on that relationship. Six are Moses's siblings, who "easily" satisfy the "immediate family" requirement. Fritz v. Islamic Republic of Iran ("Fritz II"), Civil Action No. 15-456 (RDM), 2020 WL 1821119, at *3 (D.D.C. Apr. 10, 2020) (citing Murphy, 740 F. Supp. 2d at 75). The final plaintiff, Martin Njeri, is effectively Moses's adoptive son. See Greenspan R. & R. at 26; see also Aff. of Martin Munga Njeri in Supp. of Pls.' Fed. R. Civ. P. 59(e) & 60(b) Mot. [ECF No. 38-3] ¶ 5 (describing himself as "legally adopted" by Moses "under Kenyan Kikuyu customary law"). "[T]he D.C. Circuit has recognized that 'immediate family members' may include 'members of the victim's household' who are 'viewed as the functional equivalents of immediate family members.'" Fritz v. Islamic Republic of Iran ("Fritz I"), 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (quoting Bettis v. Islamic Republic of Iran, 315 F.3d 325, 337 (D.C. Cir. 2003)). Courts have extended this reasoning to include step-children and step-siblings, see, e.g., id. at 62–63; Valore, 700 F. Supp. 2d at 80; Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20,

29 (D.D.C. 2009). Here, the uncontroverted testimony of both Martin and Moses's other children "identif[ies] Martin as the son of Moses," Greenspan R. & R. at 23, and the Court has no difficulty in concluding that he is the "functional equivalent" of an immediate family member.

Finally, each of the seven plaintiffs has suffered severely from Moses's injury. See Greenspan R. & R. at 9–25 (documenting "severe emotional distress" from witnessing the trauma of Moses's injury, the damage to their close relationships with Moses, and the difficulty of supporting him thereafter). The Court thus concludes that the Iranian defendants are liable to all seven plaintiffs for solatium damages stemming from the severe injuries to Moses Kinyua during the embassy bombing.

### III. Damages

#### A. Compensatory Damages

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages.'" Salazar, 370 F. Supp. 2d at 115–16 (some internal quotation marks omitted) (quoting Hill v. Republic of Iraq, 328 F.3d 680, 681 (D.C. Cir. 2003)). Like the plaintiffs in Wamai, "[p]laintiffs here have proven that the consequences of defendants' conduct were reasonably certain to—and indeed intended to—cause injury to" government employees at the embassy, like Moses Kinyua. Wamai, 60 F. Supp. 3d at 89. Likewise, the immediate family members of those victims are also "entitled to solatium damages" to compensate them for the anguish and suffering connected to the purposeful injury of their relative. Id. at 90.

Damages for solatium "are by their very nature unquantifiable." Moradi v. Islamic Republic

of Iran, 77 F. Supp. 3d 57, 72 (D.D.C. 2015).  To bring some uniformity to these FSIA cases, however, the Court directed the special master "[t]o assess and evaluate plaintiffs' damages claims . . . by this Court's prior decisions [and] by other relevant precedent."  Order Adopting Administrative Plan at 6.  Courts in this District have established two main frameworks, sometimes called the "Peterson II" or "Heiser" frameworks, for evaluating solatium damages for terrorist victims and their family members.  See Estate of Brown v. Islamic Republic of Iran, 872 F. Supp. 2d 37, 45 (D.D.C. 2012) (treating the frameworks as equivalents).  Based on the Peterson II framework, which this Court has previously endorsed when evaluating solatium damages for siblings and children, see Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 44–45 (D.D.C. 2014), the special master recommended that five of Moses's siblings receive "an award of $1.25 million" in solatium damages, Greenspan R. & R. at 13, 15, 18–19, 21; that Geofrey Kinyua receive "an enhanced award of $1.5 million," id. at 11; and that Moses's adoptive son, Martin Njeri, be awarded "$2.5 million in solatium damages," id. at 25.  The Court adopts each of these recommendations.

First, under the Peterson II framework, the standard damages awards for the immediate family members of an injured victim are $1.25 million for siblings and $2.5 million for children.  See Mwila, 33 F. Supp. 2d at 44–45 (citing Peterson II, 515 F. Supp. 2d at 51–53).  Here, the special master follows those recommendations for all but Geofrey Kinyua, and the Court sees no reason to deviate from these six standardized awards.

In the case of Geofrey Kinyua, the Court concludes that the special master's recommendation of an additional $250,000 enhancement over the Peterson II baseline is also appropriate.  In general, factors that recommend the awarding of an enhancement include "evidence establishing an especially close relationship between the plaintiff and decedent . . . ; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made

11

the suffering particularly more acute or agonizing." Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 85 (D.D.C. 2017) (internal quotation omitted). Ultimately, however, the decision whether to "deviate from the starting points provided by the [Peterson II] framework are committed to the discretion of the particular court in each case." Id. (internal quotation omitted).

Here, the special master describes Geofrey Kinyua as "sacrifice[ing] his own family and employment to care for his brother," including "spen[ding] months assisting his severely injured brother to begin the recovery process." Greenspan R. & R. at 10. As a result, Geofrey "lost his job of 24 years" as well as his benefits, was separated from his wife and eventually divorced, and "suffered from heavy alcohol consumption, sleeplessness, and lonesomeness." Id. Such a commitment to helping his brother, including being present at the hospital and "talk[ing] to Moses for at least two hours every day for three months to assist in Moses'[s] recovery," id., evinces an especially close relationship. Considering the severe negative consequences in Geofrey's own life, the Court concludes that this 20% enhancement is appropriate, and will award Geofrey Kinyua $1.5 million in solatium damages.

### B. Punitive Damages

In addition to compensation for the emotional distress caused by the terrorist attack, plaintiffs also seek punitive damages "in an amount equal to the total compensatory damages in this case." See Pls.' Mot. at 11; see also Compl. ¶¶ 88–94 & at 29. In their complaint, plaintiffs appear to seek such damages solely under § 1605A(c), while seeking compensatory damages under § 1605A as well as "state common law or Kenyan common law." Compl. at 25–27. As noted above, however, plaintiffs are Kenyan nationals and not otherwise eligible to sue under the federal cause of action created in § 1605A(c). "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings," Fed. R. Civ. P. 54(c), and plaintiffs have not included in their

complaint any request for punitive damages under a viable cause of action, cf. Fritz II, 2020 WL 1821119, at *6 ("Under D.C. law, the intentional infliction of emotional [distress] 'provide[s] an appropriate basis for an award of punitive damages' because 'it is by definition willful and outrageous conduct which society finds intolerable, and seeks to deter.'" (quoting Sere v. Grp. Hospitalization, Inc., 443 A.2d 33, 37–38 (D.C. 1982))). Of three references to punitive damages in their complaint, two specifically refer to § 1605A(c), see Compl. at 27–28, and the third reference limits punitive damages to "the amounts demanded in this Complaint for Damages," id. at 29, in other words, to those punitive damages sought under the federal cause of action at § 1605A(c). Abiding by the strictures of Rule 54(c), the Court thus concludes that plaintiffs have failed to seek punitive damages under a viable cause of action, and therefore deny them such relief.[1] See Frost v. Islamic Republic of Iran, 419 F. Supp. 3d 112, 115–16 (D.D.C. 2020) (gathering cases interpreting Fed. R. Civ. P. 54(c) to bar, in a default judgment, relief not requested in complaint).

C. Prejudgment Interest

Plaintiffs next seek prejudgment interest on their compensatory damages. "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations." Oveissi II, 879 F. Supp. 2d at 58. While this Court has previously awarded prejudgment interest on similarly situated plaintiffs' awards, including pain and suffering and solatium, Opati, 60 F. Supp. 3d at 82, other courts have concluded that awards following the so-called Peterson II framework, as these do, already "represent the appropriate level of compensation, regardless of the timing of the attack." See Brown, 872 F. Supp. 2d at 45; Oveissi v. Islamic Republic

---

[1] Hence, plaintiffs also cannot rely on yesterday's decision by the Supreme Court in Opati v. Republic of Sudan, No. 17-1268 (U.S. May 18, 2020), which concluded that, under the federal cause of action at § 1605A(c), claimants can recover punitive damages for wrongful conduct occurring prior to the enactment of § 1605A in 2008. See Opati, slip op. at 12.

of Iran ("Oveissi I"), 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011); see also Oveissi II, 879 F. Supp. 2d at 59 (gathering cases wherein prejudgment interest was denied). Following the Court's general practice, and based on the special master's recommendation, see Greenspan R. & R. at 11–25, the Court concludes that an award of prejudgment interest is appropriate in this case.

"Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks." Khaliq v. Republic of Sudan, 33 F. Supp. 3d 29, 34 (D.D.C. 2014), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017). "A solatium award is therefore best viewed as fixed at the time of the loss," Fritz I, 324 F. Supp. 3d at 64, and plaintiffs are entitled to the full amount of their award as if they received it in 1998. Failing to do so would not only place the present plaintiffs at a disadvantage relative to their family members in earlier litigation, but would also allow the Iranian defendants "to profit from the use of the money over the past [two] decades." Estate of Doe v. Islamic Republic of Iran, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013).

The Court will calculate the appropriate interest using the prime rate for each year, as the D.C. Circuit has recommended. See Forman v. Korean Air Lines Co., 84 F.3d 446, 450 (D.C. Cir. 1996). "Although the prime rate, applied over a period of several years, can be measured in different ways, the D.C. Circuit has approved an award of prejudgment interest 'at the prime rate for each year between the accident and the entry of judgment.'" Opati, 60 F. Supp. 3d at 83 (quoting Forman, 84 F.3d at 450). Using the prime rates for each year since the 1998 embassy bombing through 2019 results in a multiplier of 2.917169, which the Court will apply in calculating the total award.[2]

---

[2] More specifically, the Court calculated this multiplier using the Federal Reserve's data for the average annual prime rate in each year from 1998 to 2020. See Bd. Of Governors of the Fed. Reserve Sys., Data Download Program, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last visited May 19, 2020). To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1998 (8.35%) and discounted that interest by the

D.  Attorney's Fees & Costs

Finally, plaintiffs seek compensation for the costs of this suit, including "[c]osts and expenses," "[a]ttorney's fees," and "[s]uch other and further relief" as the Court deems appropriate. Compl. at 29.  However, the Court is not aware of any statutory or other basis for the award of attorney's fees, nor have "plaintiffs . . . provided any information regarding the fees and costs sought." Aceto, 2020 WL 619925, at *23.  The Court will thus deny plaintiffs' request for attorney's fees and costs.

**Conclusion**

For the foregoing reasons, the Court concludes that plaintiffs have demonstrated a severe loss as a result of Iran's deliberate and extreme conduct.  Because the evidence in the record and the Court's prior decisions sufficiently support the allegations in their complaint, judgment will be entered for plaintiffs on their intentional infliction of emotional distress claim.  The Court will award compensatory damages totaling $10.25 million plus prejudgment interest.  A separate order specifying each plaintiff's award will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:  May 19, 2020

---

percentage of the year left from August 7, 1998, to December 31, 1998 (40%), yielding $1.0334.  Then, the Court took that amount and multiplied it by the prime rate in 1999 (8%) and added that amount to $1.0334, yielding $1.116072.  The Court continued this iterative process through May 19, 2020, resulting in a multiplier of 2.917169.  See Opati, 60 F. Supp. 3d at 83 n.10.  For 2020, the Court estimated the rate to be 4.065%—the average for the past six years—and again discounted the interest by the percentage of the year that has elapsed to date (38.2514%).  See id. at 83 n.11.